**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| JOEL CAMARENA, on behalf of himself and those similarly situated,<br><br>     Plaintiff,<br><br>  v.<br><br>CBR SYSTEMS, INC., a foreign corporation<br><br>     Defendant. | Case No.: _____<br><br><br>**CLASS REPRESENTATION** |

**PLAINTIFF'S COMPLAINT AND JURY DEMAND**

Plaintiff Joel Camarena ("Plaintiff"), on behalf of himself and all others similarly situated, brings this action against Defendant CBR Systems, Inc. ("CBR") and alleges as follows:

**INTRODUCTION**

1.  This is an action to address CBR's false and misleading statements to parents throughout the United States related to the efficacy of its umbilical cord blood banking program. Although CBR charges families thousands of dollars for its services, the evidence will show that those services are largely worthless with regard to their advertised purpose.

2.  CBR collects and stores umbilical cord blood and tissue throughout the United States by aggressively marketing its services as a potentially life-saving treatment option for children. The thrust of CBR's objectively misleading and deceptive message to expectant parents is that the stem cells within a newborn's umbilical cord blood and tissue may be privately stored for later use to treat at least eighty serious medical conditions that the child or a sibling may develop. Additionally, CBR touts a sweeping range of additional medical conditions and injuries for which cord blood and tissue may be approved for treatment in the future.

3. What CBR does not tell expectant parents is that the odds a child could ever use her own cord blood or tissue to effectively treat a medical condition are virtually zero. Contrary to CBR's claims, the Food and Drug Administration ("FDA") has only approved the use of a child's own cord blood for treatment of seven medical conditions—not eighty plus. A child's own cord blood most often contains the same defects that caused the medical condition for which treatment is sought, rendering the cord blood useless to the suffering child. In most cases, a child requires a stem-cell donation from public sources. And while CBR also pushes the use of a child's cord blood for treatment of siblings' medical conditions, such use is still incredibly rare. Of the more than one million cord blood unit stored,[1] CBR admits that only about 700 families have ever used their child's cord blood for any sort of treatment, whether for the child or someone else,[2] and the vast majority of these treatments have been for non-FDA-approved purposes.[3] Piecing together these statistics that CBR scatters throughout its webpages leads to the rough calculation that a mere one-hundredth of one percent of CBR's cord-blood units have ever been used on any patient for an FDA-approved treatment.[4] Furthermore, the research surrounding cord tissue is still so unsettled that the FDA has not approved the use of cord tissue to treat *any* medical condition.

4. Unsurprisingly, CBR does not reasonably disclose this information to expectant parents. Nor does CBR reasonably disclose that the vast majority of cord-blood transplants originate from public banks, or that there may not be enough stem cells in a newborn's collection to be viable in a later medical treatment—a fact that is especially true as a child ages and the

---

[1] *Why preserve with CBR?*, CBR (last visited Mar. 13, 2024), https://www.cordblood.com/why-cbr.

[2] *Family stories*, CBR (last visited Mar. 13, 2024), https://www.cordblood.com/family-stories.

[3] *The science behind newborn stem cells*, CBR (last visited June 5, 2023), https://www.cordblood.com/science-in-action.

[4] *See id.*; supra notes 1 and 2. Of the one million cord-blood units banked with CBR, around 700 have been released, and of those, less than twenty percent have been used for a non-experimental purpose.

quantity of stem cells required for any given treatment likewise increases.  Yet CBR willingly sells parents storage of stem cells and tissue for eighteen years, or even a lifetime, knowing that for the vast majority of this time the quantity of cells collected at birth will be inadequate for any form of treatment at all.  Further, CBR downplays the odds that a child may find a stem cell match through public cord blood banks or other sources.  Through its false and misleading business practices, CBR diverts hundreds of thousands of cord-blood units away from public banks—where they would be matched with individuals in urgent need—to CBR's own facilities, by which misinformed parents pay a premium to store cord blood that will almost certainly sit dormant until it is discarded.

5.      CBR's deceptive practices come at great cost to public cord-blood reserves.  An article published in the peer-reviewed journal BONE MARROW TRANSPLANTATION notes that globally there are six times as many cord-blood units stored in private cord-blood banks than in public banks, which rely on donations; this fact is especially unfortunate because public banks are thirty times likelier to release a cord-blood unit to treat a patient in need.[5]  This does not appear to bother CBR, which has lined its pockets by diverting over 1 million units of cord blood away from public banks.[6]  Recent statistics suggest that if CBR's units had instead been donated to public banks, they could have increased *global* cord-blood reserves by 125%.[7]

6.      By preying on the fears of expectant parents in return for essentially nothing but false hope, CBR reaps thousands of dollars from parents like Plaintiff by charging exorbitant

---

[5] *See* K.K. Ballen, et al., *Umbilical cord blood donation: public or private?*, BONE MARROW TRANSPLANTATION (Oct. 2015).

[6] *See Why preserve with CBR?*, *supra* note 1.

[7] *See* R. Waller-Wise, *Umbilical Cord Blood Banking: An Update For Childbirth Educators,* JOURNAL OF PERINATAL EDUCATION (Oct. 1, 2022) (estimating the worldwide public cord-blood reserves at 800,000 units).

processing and storage fees.  Plaintiff, on behalf of himself and class members defined below, brings this class action to redress injuries suffered because of CBR's objectively deceptive, unfair, and fraudulent practices.

**PARTIES, JURISDICTION, AND VENUE**

7.     Plaintiff Joel Camarena is an individual who is domiciled in, and is a citizen of, California.  Plaintiff brings this action for a declaratory judgment and damages against CBR based on 28 U.S.C. § 2201, 6 Del. C. § 2511, *et seq*., and common law.

8.     CBR is, upon information and belief, a Delaware corporation with its principal place of business in California.

9.     This Court has subject-matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2) as the aggregate amount in controversy exceeds $5,000,000 and many class members are citizens of States different from CBR.

10.    This Court may exercise personal jurisdiction over CBR, which does substantial and continuous business in the State of Florida and within this District, derives substantial compensation and profits from the marketing, distribution, and sale of its services in this District, and has engaged in the unlawful practices described in this Complaint within this District.

11.    Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (c)(2), and (d) because CBR resides and is subject to personal jurisdiction in this District.  CBR derives substantial compensation and profits from the marketing, distribution, and sale of its services to members of the proposed class within this District.[8]

---

[8] Venue is also appropriate here because CBR has forfeited its adhesive arbitration clause. Plaintiff filed a Statement of Claims with the American Arbitration Association ("AAA") on July 6, 2023, in accordance with CBR's contract.  Plaintiff served CBR with the Statement on July 7, 2023.  Despite repeated follow-up correspondence from the AAA to CBR, CBR failed to appear in the arbitration for over seven months.  The AAA consequently closed the case on March 1, 2024, and Plaintiff is now free to litigate his claims.

12.     Since signing the contract, Plaintiff has made annual payments to CBR for cord blood storage.

13.     Upon information and belief, CBR executed contracts with all other class members, as defined below, that are substantially similar to Plaintiff's contract with CBR.

14.     All conditions precedent to the bringing of this action have occurred, or CBR has waived them.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

15.     Cord blood consists of a child's blood and other biological material, including hematopoietic stem cells, that remain in the umbilical cord and placenta after the child is born. The stem cells in cord blood are unique because they can mature into different types of blood cells in the body.  As such, the use of stem cells from cord blood is approved by the FDA to treat a limited set of diseases and blood-related disorders, including certain kinds of leukemia and lymphoma.  Cord blood is collected by hospital staff after the umbilical cord is cut and clamped. The blood is then drawn from the umbilical cord with a needle, attached to a bag, shipped to a cord-blood "bank" and cryogenically frozen for future use.[9]

16.     Children can receive treatment from cord blood in one of two ways: an allogeneic transplant, in which a child receives cord blood donated by another person who has a cellular match, or in much rarer circumstances, through an autologous transplant, in which a child uses his or her own cord blood.[10]

17.     Cord blood is stored in one of two ways.  It is either donated to a public bank or banked through a private entity.  In the case of public cord-blood banks, the stem cells in the

---

[9] *Cord Blood Banking: FAQs*, AM. COLL. OF OBSTETRICIANS AND GYNECOLOGISTS (last visited Mar. 13, 2024), https://www.acog.org/womens-health/faqs/cord-blood-banking.
[10] *Id.*

donated cord blood may be used by anyone with a cellular match and need for treatment.  Public cord-blood banks charge nothing for donation or storage of cord blood.[11]

18.     Private cord-blood banking allows parents to pay to store their child's cord blood in the hope that, if one of a select few medical conditions arises, the cord blood might be transplanted through autologous treatment to the child herself or through allogeneic transfer to a close family member—usually a sibling.  And the private cord-blood industry is booming.  By some estimates, the private cord-blood banking market was worth $6.83 billion as of 2022 and is expected to continue growing.[12]  Over 2.5% of births in the United States opt for cord-blood storage, and as of 2017, there were approximately 5 million cord-blood units in private banks.[13]

19.     CBR is one of the oldest and most prominent private cord-blood banks.  Founded in 1992, CBR claims that 700 families have used their stem cells,[14] and boasts that it has "stored over one million newborn stem cell samples—the most in the industry."[15]

20.     CBR offers an option for the collection and storage of cord blood alone and an option for the storage of cord blood and cord tissue.  Specifically, CBR represents that "[c]ord blood stem cells can be used as part of a stem cell transplant to help rebuild the immune system for certain cancers, blood, and immune disorders," and emphasizes that these cells have the "[p]otential to treat 80+ health conditions."[16]  CBR boasts that it offers "the highest quality care

---

[11] *Id.*

[12] *U.S. Cord Blood Banking Services Market Size, Share & Trends Analysis Report*, GRAND VIEW RESEARCH (last visited Mar. 13, 2024), https://www.grandviewresearch.com/industry-analysis/us-cord-blood-banking-services-market#:~:text=b.,USD%2027.8%20billion%20in%202020.

[13] *See id.*; *AAP stresses value of public vs. private cord blood banks*, HEALIO (Oct. 30, 2017), https://www.healio.com/news/pediatrics/20171027/aap-stresses-value-of-public-vs-private-cord-blood-banks.

[14] *Family stories*, supra note 2.

[15] *Why preserve with CBR?*, supra note 1.

[16] *Newborn Stem Cell Preservation 101*, CBR (last visited Mar. 13, 2024), https://www.cordblood.com/newborn-stem-cells-101.

and protection" for children's cord-blood stem cells, offering 24/7 monitoring with regular temperature and environment checks.[17]  To this end, CBR also advertises its use of a cord-blood processing technology called AXP II, "a precise, fully automated system that [is used] to separate out the stem cells from the cord blood," that purportedly has "the highest reported average stem cell recovery rate in the industry."[18]

21.     Separately from the claimed benefits of CBR's cord-blood storage, CBR alleges that storing cord *tissue* has additional potential benefits, as different types of stem cells are present in the tissue.  Specifically, CBR represents that the cord tissue contains "mesenchymal stem cells (MSCs), endothelial stem cells, and epithelial stem cells," which it touts as potentially offering "additional treatment options in regenerative medicine," that cord blood stem cells alone cannot provide.[19]  CBR contends that these cells have the potential to "[r]educe inflammation… respiratory complications due to COVID-19, [and m]odulate the immune system to help improve autoimmune disorders," and that storing these cells, together with cord-blood cells, "could offer the most valuable protection of all."[20]

22.     Based merely on these unproven early-stage hypotheses, CBR assures parents that tissue storage allows them to "[g]ain access to a greater amount of newborn stem cell types that have more potential to heal [a] family."[21]  In turn, unsurprisingly, CBR states that storage of both cord blood and cord tissue is its most popular service.[22]

---

[17] *Why Preserve with CBR?*, supra note 1.
[18]     *Our collection process*, CBR (last visited Mar. 13, 2024), https://www.cordblood.com/collection-101.
[19] *The science behind newborn stem cells*, supra note 3.
[20] *Id.*
[21]     *Explore the Right Solution for Your Family*, CBR (last visited June 5, 2023), https://www.cordblood.com/.
[22] *Id.*

23.     CBR offers three options for storage time: "Annual Storage," "18 Year Storage," and "Lifetime Storage"—none of which comes cheaply.  To store cord blood alone under the Annual Storage option, the initial collection, processing, shipping, and storage fee costs $1,700, with reoccurring annual storage fees of $200 for each additional year of storage.  To store cord blood under the 18 Year Storage option, the collection, processing, and shipping costs $4,495 and includes 18 years of storage.  Finally, under the Lifetime Storage option, the collection, processing, and shipping costs $6,495 and includes storage of the stem cells "for lifetime," though the exact details are unstated.[23]

24.     The cost to store cord blood with the corresponding tissue is substantially higher.  As with cord-blood storage alone, there are three options for storage time: Annual Storage, 18 Year Storage, and Lifetime Storage.  To store cord blood and tissue under the Annual Storage option, the initial collection, processing, shipping, and storage fee costs $3,185, with a recurring annual storage fee of $390 for each additional year of storage.  Under the 18 Year Storage option, the collection, processing, and shipping costs $8,585 and includes 18 years of storage of both the cord blood and tissue.  Finally, under the Lifetime Storage option, the initial collection, processing, and shipping costs $12,785 and includes storage of the stem cells and tissue "for lifetime."[24]

25.     To lure expectant parents into such expensive contracts on top of an already costly childbirth process, CBR portrays to the objectively reasonable consumer that its services are a near all-encompassing biological insurance policy for children.  For example, CBR touts the following claims throughout its website:

---

[23] *How Pricing Works*, CBR (last visited Mar. 13, 2024), https://www.cordblood.com/enroll/.
[24] *Id.*

a. "Newborn stem cells found in cord blood are currently being used in transplant medicine ***to treat over 80 conditions***, including certain cancers, blood disorders, and metabolic disorders."[25]

b. "***Your baby is always a 100% match to their own newborn stem cells***, while full siblings have up to a 75% chance of being at least a partial genetic match."[26]

c. "Compared to the other ways you already protect your family, such as home or auto insurance, ***saving your baby's cord blood could offer the most valuable protection of all***. ***Because if you ever need it, the lifesaving potential of cord blood stem cells is priceless***."[27]

d. "Based on current data, cord blood stem cells ***should remain useful indefinitely, so your family may be able to use the cells for diseases and injuries that occur decades from now.***"[28]

e. "Cord blood has been used in ***more than 40,000 stem cell transplants worldwide***, from both public donor and private family banks, to help rebuild healthy blood and immune systems."[29]

f. "Research is still in early stages for cord tissue, and we want your family to have access to all the cells in the cord, and to the best available future

---

[25] *The science behind newborn stem*, supra note 3.

[26] *Id*.

[27] *FAQs: Pricing and Options: Are payment plans available?,* CBR (last visited Mar. 13, 2024), https://www.cordblood.com/faqs.

[28] *FAQs: Are there Benefits to Storing if my Family Doesn't have a History of Cancer or Disease?,* CBR (last visited Mar. 13, 2024), https://www.cordblood.com/faqs.

[29] *The science behind newborn stem cells*, supra note 3.

technologies, as research advances.  By preserving the cord tissue, we can help ensure you have the most options science has to offer in the future."[30]

    g.   "Banking cord blood ***can change or even save a life***… Today, stem cell therapies continue to evolve, bringing new hope to patients and their families."[31]

26.    CBR carefully tailors its marketing to impress upon the objectively reasonable consumer that a child's ***own*** cord blood could be used to treat that child for dozens of serious conditions.  But this is false.  The FDA has only approved the use of a child's own cord blood for the treatment of seven exceedingly rare medical conditions.  This is in part because a child's own cord blood often contains the same defects that caused the underlying medical condition for which treatment is sought.[32]  The remaining treatments are either not FDA-approved or approved for cord-blood treatment only in allogeneic transfer to close relatives.

27.    In fact, the current odds that parents could use their baby's own cord blood for treatment of ***any*** medical condition are nearly zero.  "The chance of baby later benefiting from his or her own banked cord blood is currently less than 0.04 percent, according to the [American Society for Blood and Marrow Transplantation]."[33]  This is not only "because the diseases currently treatable with cord blood are fairly rare, but with many, the child's cord blood would be unusable because those stem cells contain the same genetic defects."[34]  Instead of clarifying these

---

[30] *FAQs: How does CBR store cord tissue?*, CBR (last visited Mar. 13, 2024), https://www.cordblood.com/faqs.

[31] *FAQs: Are there current uses for cord blood stem cells?*, CBR (last visited June 5, 2023), https://www.cordblood.com/faqs.

[32] *Cord Blood Banking: FAQs*, supra note 9.

[33] Kelli B. Grant, *Is Cord Blood Banking Worth the Cost? Here's What the Experts Say*, NBC NEWS (July 29, 2015), https://www.nbcnews.com/business/consumer/cord-blood-banking-n400561.

[34] *Id.*

limitations, however, CBR misleadingly suggests that "[y]our baby is always a 100% match to their own newborn stem cells,"[35] deceiving consumers into purchasing its services by concealing just how rare the occasion would be for an approved cord-blood treatment.

28.    CBR proffers the additionally misleading fact that "[c]ord blood has been used in more than 40,000 stem cell transplants worldwide, from both public donor and private family banks."[36]  While true as a generic statement, CBR employs this statistic in an effort to ride the coattails of the robust public cord-blood banking system.  The article CBR cites does not indicate that a significant portion of those 40,000 transplants originated in private banks, nor does the article limit the transplant number to those between a donor and close relative—the sort of transplants CBR facilitates.  Rather, the article counts worldwide cord-blood transfusions *in total*—that is, including public cord-blood bank transplants between strangers.[37]  In fact, the article's abstract makes explicit mention *only* of public cord-blood banking: "An estimated 700,000 umbilical cord blood units have been donated for public use, and over 40,000 umbilical cord blood transplantations have been performed.  Over 25,000 patients have been cured with this approach."[38]

29.    Beyond its misrepresentations regarding the efficacy of CBR's privately banked stem cells vis-à-vis the public cord-blood banking system, CBR further deceives consumers regarding the reliability of public cord-blood banking.  CBR misleadingly argues that "[m]any patients are unable to find a donor in the public system, especially those who belong to minority

---

[35] *The science behind newborn stem cells*, supra note 3.

[36] *Id*.

[37] Karen Ballen, *Update on umbilical cord blood transplantation*, 6 F100 RES. 1556 (2017), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5580430/#.

[38] *Id*.

ethnic groups that are not adequately represented in public banks."[39]  This is a scare tactic.  In reality, the vast majority of individuals who need stem cells successfully match with a donor.  "A 2014 study in the New England Journal of Medicine found that, depending on a patient's ethnic background, 66 percent to 97 percent can find a suitable match among donated umbilical cord-blood units or live bone-marrow donors in the National Marrow Donor Program's Be the Match Registry."[40]  CBR falsely induces new parents into purchasing its product by keeping them in the dark about free, public options for stem cell treatments.

30.    There are numerous other shortcomings with private blood banking that CBR attempts to sweep under the rug.  For example, CBR touts cord-blood stem cell research as "an exciting new area of medicine called regenerative medicine," in which cord blood may be used in "experimental treatments for conditions like brain injury and acquired hearing loss."[41]  But, as of 2020, no cord-blood therapy had made it past Phase 2 trials for those conditions, much less earned FDA approval.[42]  Further, unlike FDA-regulated public banks, private banks like CBR do not need to meet the same quality or viability standards and sometimes do not impose a floor on how many stem cells must be collected.  That is, even in the limited set of circumstances for which privately banked stem cells could theoretically be of use, there is no guarantee that the banked cord blood will contain enough stem cells for a successful transplant, particularly for older children or adults.

31.    In addition to these false and misleading statements, CBR also omits numerous material facts to induce consumers to purchase its services based on a deficient understanding of

---

[39] *FAQs: Can I get a sample from a public bank?* CBR (last visited Mar. 13, 2024), https://www.cordblood.com/faqs.

[40] Grant, supra note 33.

[41] *FAQs: What are Stem Cells?*, CBR (last visited Mar. 13, 2024), https://www.cordblood.com/faqs.

[42] Dana Jannar, *Should You Bank Your Baby's Cord Blood?*, N.Y. Times (Dec. 18, 2020), https://www.nytimes.com/2020/12/18/parenting/pregnancy/cord-blood-banking.html.

cord-blood banking.  For example, nowhere on its website does CBR advertise how few of its families who have "used their stem cells" have used them for an FDA-approved purpose.[43]  Rather, CBR does state that "[m]ore than 80% of the cord blood used by CBR client families has been used for experimental regenerative medicine applications, like cerebral palsy and autism," but fails to clarify that none of the "experimental regenerative medicine applications" are FDA-approved.[44]

32.     Furthermore, while CBR touts that "[t]o date, [it] ha[s] released more than 600 samples for families to use," and that "[a]ll of the cord blood units released for client use have been viable,"[45] CBR does not explain what "viable" means (and a consumer looking to ascertain what "viability" means will only be met with frustration as multiple hyperlinks reroute the user to various pages that likewise fail to define the term),[46] for what treatments the cord-blood units were used, or whether the stem cells were transplanted to the donor-child, sibling, or someone else. Without explanation of its terms and treatments or elaboration as to the efficacy of the cord blood and tissue when used, it is impossible for parents to fairly assess whether the CBR's services are worth thousands of dollars.  Indeed, while CBR conspicuously asserts that they've helped "hundreds of families," CBR's website articulates just nine "Family Stories," of which only two

---

[43]     *Comparison        guide,*        CBR        (last        visited        Mar.        13,        2024), https://www.cordblood.com/comparison-guide.

[44] *The science behind newborn stem cells*, supra note 3.

[45] *FAQs: How Many People Have Used Their Cord Blood Samples from CBR?*, CBR (last visited June 5, 2023), https://www.cordblood.com/faqs.

[46] Specifically, clicking the hyperlink for CBR's claim that "all of the cord blood units released for client use have been viable," takes you to CBR's Newborn Possibilities Program, where CBR promises to offer free cord blood and tissue processing and five years of storage for families with a qualifying medical need such as a sibling who has been diagnosed with a disease that is currently treatable with stem cells.  *See Family Programs*, CBR (last visited Mar. 13, 2024), https://www.cordblood.com/family-programs.  Nothing on that page defines the term "viable" or "viability."  CBR also provides a footnote numbered 138 at the end of its viability claim, which only leads to the following obscure reference: "Internal source. Data on file."  *See References*, CBR (last visited Mar. 13, 2024), https://www.cordblood.com/references.

families used cord blood for an FDA-approved treatment, and both of which were for a patient other than the donor-child.

33.     Given these unfair and deceptive practices, it is no wonder that prominent institutions like the American College of Obstetricians and Gynecologists advise that "[s]toring a child's stem cells in a private bank as 'insurance' against future disease is not recommended."[47] This has not stopped CBR from aggressively pushing its false and misleading marketing. Consequently, tens of thousands of parents have spent thousands of dollars for a service they and their children will never be able to use.  CBR, meanwhile, has reaped millions of dollars.

## CLASS REPRESENTATION ALLEGATIONS

34.     Plaintiff asserts his claims as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) on behalf of all Class Members.

35.     Plaintiff seeks certification of a Class of all consumers in the United States who contracted with CBR for private cord-blood banking.

36.     The Class consists of all United States residents, including Plaintiff, who: (a) on or after July 6, 2020; (b) contracted with or paid CBR for cord blood and tissue collection or storage services; (c) agreed in their contracts with CBR to store cord blood and cord tissue for a fee; (d) have fully performed their contractual obligations; and (e) have not used their child's banked cord blood or cord tissue for any medical purpose.  The class period will be from July 6, 2020, to the date of class certification (hereinafter the "Class Period").

37.     Plaintiff reserves the right to amend this definition as discovery proceeds and to conform to the evidence.

---

[47] *Cord Blood Banking: FAQs*, *supra* note 9.

38.     Excluded from the Class are CBR, its agents, representatives, and employees; any judge to whom this action is assigned; any member of that judge's staff and immediate family.

39.     While the exact number of Class Members is unknown at this time, Plaintiff submits that, upon information and belief, there are thousands of individuals throughout the United States who are potential Class Members in this action.   Because the Class Members are so numerous, individual joinder of these Class Members is impracticable.

40.     Plaintiff further alleges that the Class Members will be ascertainable through CBR's electronic records, data, and databases.

41.     There are common questions of law and/or fact shared by Plaintiff and each member of the Class.   These common questions of law and/or fact include, but are not limited to, the following:

a.     Whether CBR's marketing tactics and other conduct were deceptive, unfair, false, or misleading to a reasonable consumer;

b.     Whether CBR breached its contractual obligations;

c.     Whether Plaintiff and the Class Members conferred a benefit upon CBR, and whether CBR accepted and retained that benefit;

d.     Whether it would be inequitable for CBR to retain the benefits it accepted from Plaintiff and the Class Members;

e.     Whether any of CBR's conduct caused injury to Plaintiff and the Class Members.

42.     Based on the above questions of law and fact, Plaintiff's claims are typical of the claims that would be asserted by other Class Members in that, in proving his claims he will simultaneously prove the claims of all Class Members.   The rights afforded under Delaware law

are the same for Plaintiff and Class Members.  Each Class Member had the same interaction with CBR.

43.     Plaintiff is a Class Member.  He is an adequate representative of the Class Members because his interests do not conflict with the interests of other Class Members, and he will fairly and adequately protect their interests.  Additionally, Plaintiff is cognizant of his responsibility as class representative and has retained experienced counsel fully capable of, and intent upon, vigorously pursuing the action.  Class counsel have extensive experience in class action litigation.

44.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Among other things, class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

45.     CBR acted or refused to act on grounds that generally apply to the whole Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

46.     Prosecution of separate claims by individual Class Members would create a risk of inconsistent or varying adjudications for Class Members, which would establish incompatible standards of conduct for CBR.

47.     The Class Members have suffered actual damages, losses, and harms as those sustained by Plaintiff.

16

<u>COUNT I</u>
<u>DELAWARE CONSUMER FRAUD ACT</u>

48.     Plaintiff re-alleges paragraphs 1–47 as if fully set forth herein and further alleges the following.

49.     Count I is brought pursuant to the Delaware Consumer Fraud Act ("DCFA"). Plaintiff brings Count I individually and for the Class Members defined above.

50.     Plaintiff and all Class Members are consumers intended to be protected by the DCFA and are entitled to relief under the DCFA in accordance with 6 Del. C. § 2525.

51.     At all material times, CBR conducted trade and commerce within the meaning of 6 Del. C. § 2511.

52.     At all material times that Plaintiff and Class Members were deciding whether to contract with CBR for cord blood and tissue storage, CBR engaged in objectively unlawful schemes and courses of conduct through one or more of the unfair and deceptive acts and practices alleged above, *see,* supra, ¶¶ 24–31, which were likely to deceive a consumer acting reasonably in the same circumstances.

53.     The misrepresentations, deceptions, concealment, and omissions of material facts alleged in the preceding paragraphs occurred in connection with CBR's trade and commerce in Delaware.

54.     CBR's unfair and deceptive acts and practices violate 6 Del. C. § 2512.

55.     But for CBR's unfair and deceptive acts and practices, Plaintiff and Class Members would not have contracted with CBR for cord blood and tissue storage.

56.     Plaintiff and the Class Members have suffered losses in making payments to CBR under the contracts for cord blood and tissue collection and storage the parties formed as a result

of CBR's unfair and deceptive acts, and thus Plaintiff seeks an award of damages on behalf of himself and the Class Members, in an amount to be proved at trial.

**COUNT II**
**DELAWARE CONSUMER CONTRACTS ACT**

57.     Plaintiff re-alleges paragraphs 1–47 as if fully set forth herein and further alleges the following.

58.     Count II is brought pursuant to the Delaware Consumer Contracts Act ("DCCA"). Plaintiff brings Count II individually and for the Class Members.

59.     Plaintiff and each of the Class Members entered into valid contracts with CBR for the sale of merchandise, namely the cord-blood and/or cord-tissue storage kit and accompanying storage services.

60.     CBR distorted or obscured the terms, conditions, or meaning of the contracts, namely the Consumer Services Agreement and the various terms and conditions set throughout its website.

61.     CBR omitted information required by law to be disclosed in contracts with a consumer.

62.     CBR's contracts violate 6 Del. C. § 2731 et seq.

63.     CBR's violations aggrieved Plaintiff and the Class Members and treble damages are available to them, 6 Del. C. § 2734(a).

**COUNT III**
**BREACH OF CONTRACT**

64.     Plaintiff re-alleges paragraphs 1–47 as if fully set forth herein and further alleges the following.

65.     Count III is a breach of contract claim brought under Delaware law.  Plaintiff brings Count III individually and for the Class Members.

18

66.     Plaintiff and each of the Class Members entered into valid contracts with CBR for the collection and storage of cord blood or cord blood and cord tissue.

67.     Plaintiff and the Class Members have fully performed their obligations under the contracts.

68.     CBR materially breached those contracts by promising to supply services that it cannot fulfill, including, for example, autologous transplants of cord blood for FDA-approved treatments.

69.     Plaintiff and the Class Members have suffered damages, in an amount to be proven at trial, because of CBR's material breach.

## COUNT IV
## UNJUST ENRICHMENT

70.     Plaintiff re-alleges paragraphs 1–47 as if fully set forth herein and further alleges the following.

71.     Count IV is an unjust enrichment claim brought under Delaware law.  Plaintiff brings Count IV individually and for the Class Members.  To the extent necessary, Plaintiff pleads Count IV in the alternative.

72.     Plaintiff and all Class Members conferred a benefit on CBR through the payment of fees intended to pay for collection and storage services offered by CBR.

73.     CBR voluntarily accepted and retained the benefit that Plaintiff and the Class Members conferred on CBR, with full knowledge that its acceptance and retention of those fees bore virtually no relationship to the services CBR advertises.

74.     Under the circumstances of CBR's objectively deceptive, unfair, and fraudulent acts described above, it would be inequitable to allow CBR to retain this benefit without paying the value of the benefit to Plaintiff and the Class Members.

## COUNT V
## DECLARATORY JUDGMENT

75.      Plaintiff re-alleges paragraphs 1–47 as if fully set forth herein and further alleges the following.

76.      Count V is a claim for a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and Fed. R. Civ. P. 57.  Plaintiff brings Count V individually and for the Class Members.

77.      A bona fide controversy presently exists between Plaintiff and the Class Members on one hand and CBR on the other, as to whether CBR has violated the DCFA, breached its contracts with Plaintiff and the Class Members, or otherwise violated applicable law.

78.      Plaintiff is an interested party who is in doubt about and seeks a declaration regarding the Class Members and their rights and legal relationships concerning their contracts with CBR and the application of applicable law.

79.      Plaintiff's interests are adverse to CBR, as Plaintiff's claims against CBR could be detrimental to CBR's business practices and financial state.   Further, Plaintiff's requested declaration deals with present, ascertainable facts.  Plaintiff does not seek a declaration regarding future facts or rights.

80.      Plaintiff and all putative Class Members are in the same predicament, each suffering from CBR's violations of state law and breaches of the parties' contracts.

81.      The rights, status, or equitable relations of the parties are affected by the express terms of the policy and Delaware law.  Accordingly, pursuant to the Declaratory Judgment Act, Plaintiff and the Class Members may obtain a declaration of rights, status, or other equitable or legal relations thereunder.

82.     Plaintiff does not seek a forward-looking declaration, but merely seeks a declaration resolving a present controversy concerning past acts.

83.     Fed. R. Civ. P. 57 states, in pertinent part: "The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate."  Thus, regardless of whether damages are available to Plaintiff and the Class Members, the Court may determine the parties' respective rights, status, and other equitable or legal relations under the parties' contracts and applicable law.

84.     28 U.S.C. § 2201(a) states, in pertinent part, that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."  Thus, the Court may determine the rights of "any interested person" (such as Plaintiff or each Class Member) who is in doubt about his or her rights under their contracts with CBR and any applicable laws, and whether CBR has breached its contracts with Plaintiff and the Class Members or whether CBR has otherwise violated applicable law.

85.     Plaintiff's and the Class Members' rights depend on the Court's determination of the facts and application of the facts to law to resolve the disputes contained herein.

86.     Individually, and on behalf of the Class Members defined above, Plaintiff now petitions for a declaration that CBR's willful misrepresentations and omissions provide a basis for rescission of the contracts of Plaintiff and Class Members.

87.     Individually, and on behalf of the Class Members defined above, Plaintiff and the Class Members seek recission of their contracts with CBR based on the declaration they seek here.

## COUNT VI
## FRAUDULENT INDUCMENT

88.    Plaintiff re-alleges paragraphs 1–47 as if fully set forth herein and also alleges the following.

89.    This is a count for fraudulent inducement.  Plaintiff brings this count individually and for the Class Members.

90.    CBR, as detailed in the allegations herein, made multiple false statements concerning material facts related to a parent's decision to purchase cord-blood banking services. *See*, supra, ¶ 24.

91.    CBR knew at the time of making these representations that they were false and an inaccurate representation of what CBR's services could provide to Plaintiff and Class Members.

92.    In making these misrepresentations, CBR intended to induce action by Plaintiff and Class Members.  Specifically, CBR sought to induce new parents into purchasing its services, thereby committing to spend thousands of dollars, while knowing that its services could not provide the benefits that CBR claimed.

93.    Plaintiff and Class Members relied on these false statements to their detriment, as each spent thousands of dollars for services that are unable to meet their intended and represented purpose.

## COUNT VII
## CALIFORNIA CONSUMERS LEGAL REMEDIES ACT

94.    Plaintiff re-alleges paragraphs 1–47 as if fully set forth herein and further alleges the following.

95.    Count VII is brought pursuant to the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, et seq.  Plaintiff brings Count VII individually and for the Class Members.  To the extent necessary, Plaintiff pleads Count VII in the alternative to Count I.

96.     CBR's actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

97.     Plaintiff and all Class Members are "consumers" as that term is defined by Cal. Civ. Code § 1761(d).

98.     CBR's cord blood and tissue collection and storage services are "services" within the meaning of Cal. Civ. Code § 1761(b).

99.     At all material times that Plaintiff and Class Members were deciding whether to contract with CBR for cord blood and tissue storage, CBR was engaged in objectively unlawful schemes and courses of conduct in violation of Cal. Civ. Code § 1770(a) through one or more of the unfair and deceptive acts and practices alleged above, *see* supra, ¶¶ 24–31, which were likely to deceive a consumer acting reasonably in the same circumstances.

100.     The misrepresentations, deceptions, concealment, and omissions of material facts alleged in the preceding paragraphs occurred in connection with CBR's advertisements and sales in California.

101.     But for CBR's unfair and deceptive acts and practices, Plaintiff and the Class Members would not have contracted with CBR for cord blood and tissue storage.

102.     As a result of CBR's unfair and deceptive acts, Plaintiff and the Class Members have suffered damages by paying CBR pursuant to the contracts the parties formed for cord blood and tissue collection and storage.

103.     Plaintiff now seeks an award of damages, together with appropriate penalties, including punitive damages, attorneys' fees, filing fees, and costs of suit, pursuant to Cal. Civ. Code § 1780, on behalf of himself and the Class Members, in an amount to be proved at trial.

<u>**COUNT VIII**</u>
<u>**CALIFORNIA UNFAIR COMPETITION LAW**</u>

104.     Plaintiff re-alleges paragraphs 1–47 as if fully set forth herein and further alleges the following.

105.     Count VIII is brought pursuant to the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq.  Plaintiff brings Count VIII individually and for the Class Members.  To the extent necessary, Plaintiff pleads Count VIII in the alternative to Count I.

106.     The UCL is, by its terms, a cumulative remedy, such that remedies under UCL's provisions can be awarded in addition to those remedies provided pursuant to other sources of law.

107.     Plaintiff and all Class Members are "persons" for the purposes of the UCL in accordance with Cal. Bus. & Prof. Code § 17201.

108.     At all material times that Plaintiff and Class Members were deciding whether to contract with CBR for cord blood and tissue storage, CBR was engaged in objectively unlawful schemes and courses of conduct through one or more of the unfair acts and practices alleged above, *see* supra, ¶¶ 24–31.

109.     CBR has engaged, and continues to engage, in unlawful practices by, without limitation, violating the CLRA as described herein.

110.     The misrepresentations, deceptions, concealment, omissions of material facts, and unlawful conduct alleged in the preceding paragraphs occurred in connection with CBR's advertisements and sales in California.

111.     But for CBR's unfair and unlawful acts and practices, Plaintiff and Class Members would not have contracted with CBR for cord blood and tissue storage.

112.     CBR's acts and omissions are likely to deceive the general public.

113.    CBR engaged in these unfair and unlawful practices to increase its profits. Accordingly, CBR has engaged in unlawful trade practices, as defined and prohibited by Cal. Bus. & Prof. Code § 17200, et seq.

114.    As a direct and proximate result of CBR's unfair and unlawful practices, Plaintiff and the Class Members have suffered monetary loss by paying CBR pursuant to the contracts the parties formed for cord blood and tissue collection and storage.

115.    Plaintiff now seeks an award of restitution on behalf of himself and the Class Members, in an amount to be proved at trial.

## PRAYER FOR RELIEF

Plaintiff and the Class Members seek the following relief:

   a.  Certification of the Class;

   b.  A monetary judgment against CBR for actual damages suffered by Plaintiff and the Class Members;

   c.  A declaratory judgment that CBR violated DFCA, breached its contracts with the Class Members, and has been unjustly enriched;

   d.  The costs of this action, including reasonable attorneys' fees and pre-judgment and post-judgment interest as provided by law; and

   e.  Such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Date: March 27, 2024

Respectfully submitted,

_s/ Alec H. Schultz_
Alec H. Schultz
Carly A. Kligler
HILGERS GRABEN PLLC
1221 Brickell Avenue, Suite 900
Miami, Florida 33131
Telephone:  305.630.8304
Email:  aschultz@hilgersgraben.com
Email: ckligler@hilgersgraben.com

*Counsel for Plaintiff and the Proposed Class*